Commonwealth, Appellant, *v.* Vallone.

Argued May 25, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

420

*Irving W. Coleman*, Assistant District Attorney, with him *Henry K. Van Sickle*, District Attorney, for appellant.

*R. C. Mauch*, of *Mauch & Goodman*, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, June 30, 1943:

We allowed an appeal by the Commonwealth in this case because there is involved the proper interpretation and application of a rule of evidence which is of extreme importance, especially in its effect upon methods of criminal investigation by law enforcement officers.

Defendant was indicted under the Act of June 24, 1939, P. L. 872, section 517, for knowingly transporting a female for the purpose of prostitution. At the trial the court admitted testimony given by a member of the Pennsylvania Motor Police to the effect that defendant, after his arrest, was brought from jail to the district attorney's office where there were present, in addition to the witness and the girl, the district attorney's secretary and a detective; that the young woman, under questioning, told in detail of her transportation by defendant from one place to another and of having given him money received by her as the wages of prostitution; that defendant said nothing and did not deny any of the statements made by the girl in his presence.

Defendant was convicted and sentenced. A reading of the record leads irresistibly to the conclusion that he

was guilty of the repulsive crime with which he was charged.[1] Because, however, of the testimony given by the motor policeman the Superior Court (*Commonwealth v. Vallone*, 151 Pa. Superior Ct. 431, 30 A. 2d 229) granted a new trial.[2]

The rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made. The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt. Of course, it is far from conclusive; it is analogous to the rule which permits evidence of the flight of the accused, his demeanor and conduct when charged with crime or taken into custody, and other acts and circumstances indicating his reaction to the situation in which he is involved. The accusatory statement, being hearsay, is not admissible as evidence in itself of the facts which it asserts, but merely to show what the charges were to which defendant offered no denial; its probative force is derived, not from the credibility of the accuser, but from the silence of the accused in response to it.

The Superior Court, while fully recognizing the general rule, deemed it inapplicable because of the circum-

---

[1] The girl testified at the trial to the same facts as those stated by her in the presence of defendant in the district attorney's office.

[2] The Superior Court referred in its opinion to the fact that during the trial one of defendant's witnesses was arrested and kept in confinement overnight. It properly condemned this action, which, however, had not been presented in the trial court as a reason for a new trial nor assigned as error in the Superior Court.

stances which prevailed when the girl's statement was made and which it enumerated as follows: (1) the meeting was "deliberately staged" for the purpose of procuring evidence; (2) it was a relatively formal proceeding; (3) defendant was under arrest at the time; (4) he was there under compulsion; (5) the others present were "hostile" to him; (6) he was not asked any questions until after the meeting had been concluded. In our opinion these circumstances were important factors for the consideration of the jury in determining the *weight* to be given to the defendant's silence under accusation, but they do not, either singly or collectively, impair the *admissibility* of the evidence.

The view taken by the Superior Court is not justified by precedent. The cases are abundant in which such evidence was received where the incriminating statement had been made in the presence of the accused *after* his arrest and while in custody;[3] for example: *Commonwealth v. Aston*, 227 Pa. 112, 75 A. 1019; *Commonwealth v. Ballon*, 229 Pa. 323, 78 A. 831; *Commonwealth v. DePalma*, 268 Pa. 25, 110 A. 756; *Commonwealth v. Carelli*, 281 Pa. 602, 127 A. 305; *Commonwealth v. Rose*, 327 Pa. 220, 193 A. 17; *Commonwealth v. Turza*, 340 Pa. 128, 16 A. 2d 401; *Commonwealth v. Murphy*, 92 Pa. Superior Ct. 139. In none of these cases, nor in *Commonwealth v. Weigand*, 134 Pa. Superior Ct. 603, 5 A. 2d 385, was the accused present *voluntarily* at the interview in which the accusatory statement was made, the meetings were quite as formal as in the present instance, and the persons who did the interrogating were law enforcement officers. If those who here participated can be said to have been "hostile" there is no reason for assuming they were more so than the chief of police in

---

[3] In fairness it should be noted that several jurisdictions refuse to apply the rule after arrest has taken place. Pennsylvania, however, has consistently stood with those which do not recognize any distinction in that regard.

*Commonwealth v. Aston,* 227 Pa. 112, 75 A. 1019, or the district attorney in *Commonwealth v. Rose,* 327 Pa. 220, 223, 193 A. 17, 18, and *Commonwealth v. Karmendi,* 328 Pa. 321, 335, 195 A. 62, 67, 68, or the chief of county detectives in *Commonwealth v. Petrillo,* 341 Pa. 209, 227, 228, 19 A. 2d 288, 297, or the police in *Commonwealth v. Beati and Burrell,* 86 Pa. Superior Ct. 567, and *Commonwealth v. Murphy,* 92 Pa. Superior Ct. 139, or the detectives in *Commonwealth v. Weigand,* 134 Pa. Superior Ct. 603, 5 A. 2d 385. Only where the incriminating statement is made in the course of a judicial hearing has it been held that the silence of the accused is not admissible in evidence against him: *Commonwealth v. Zorambo,* 205 Pa. 109, 54 A. 716. As to the "staging" of the meeting, a planned attempt to obtain evidence concerning a crime already committed has never been held in this jurisdiction to render the evidence inadmissible. Nor is it of controlling importance whether the accused is expressly invited to admit or deny the charges made in his presence.

Our conclusion, as already indicated, is that the view adopted by the Superior Court errs in its failure to distinguish between the competency of the evidence and the weight that should be attributed to it by the jury. Undoubtedly it is evidence of such a nature as to require that it be appraised with caution, and if it be referred to at all by the trial judge in his charge he should so instruct the jury. Persons do not all react the same way in identical situations; where one is emotional, impulsive and quick to assert his rights, another may be timid and easily cowed, especially in the presence of officers of the law; the rule reflects only in the manner in which the *average* man is apt to conduct himself in such a situation. Similarly in regard to flight, although generally "the wicked flee when no man pursueth, but the righteous are bold as a lion," there are some people who, though guiltless of wrong-doing, have a deep-seated fear of policemen and the processes of the law. While

not a bar to the admissibility of the evidence, the fact that the person accused was under arrest and that the charges against him were made by or in the presence of officials is to be taken into consideration by the jury in determining whether his standing mute should give rise to an inference of guilt. The only questions for the court in passing upon the admissibility of the evidence are whether the statements made in the presence and hearing of the accused were such as would naturally call for a denial and whether it was reasonably apparent to him that he had the opportunity and the liberty to speak; any reasons advanced by him to explain his failure to do so are then for the jury. "The probative weight to be attached to evidence of this character is peculiarly a question for the jury to decide in the light of the provocative character of the statements, the character of the surrounding circumstances . . . , and any other matters explanatory of the failure of the accused to speak": 20 Am. Jur. §1197, pp. 1049, 1050. "It is clear that no particular conduct or acquiescence can be classed as constituting a proper or improper admission, and hence it is practically impossible for a court to charge, as a matter of law, what conduct or acquiescence constitutes, or does not constitute, an admission. It is equally clear that the jury must pass upon the question, as a matter of fact, to determine its credibility, as in all other cases of circumstantial evidence": Wharton's Criminal Evidence (11th ed.) sec. 665, p. 1107.

The order of the Superior Court granting defendant a new trial is reversed, and the judgment and sentence of the Courts of Oyer and Terminer and Quarter Sessions of Northampton County are affirmed.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I dissent from the majority opinion and would affirm the well fortified opinion of the Superior Court. This defendant may have been, as the majority opinion concludes, "guilty of the repulsive crime with which he was

charged", but whether he was or not has nothing whatever to do with the question now before us. We said in ordering a new trial in the case of *Com. v. Petrillo*, 338 Pa. 65, 97 (12 A. 2d 317) : "We are not holding that there was not sufficient competent evidence offered to warrant a conviction, but we *are* holding that there was such an admixture of competent and *in*competent evidence in the testimony admitted as to deprive the defendant of the fair and impartial trial which every accused in an *American* court of justice is entitled to. . . ."

If the ruling of the majority opinion is the law of this Commonwealth, then any citizen no matter whether his repute be high or his repute be low, is liable to find that if he hears with *silent* contempt, or *silent* caution until he can consult with counsel, an accusation made against him by even the most disreputable of individuals, his very silence will be construed at his trial as an admission of the truth of these accusations. This ruling which if followed will bring about such great injustice to innocent persons is in my judgment based upon reasoning which rests on a totally false premise, to wit, that if a person does not deny something evil said about him as soon as he hears it said the evil thing is presumably true. Any person familiar with human history or human nature, ought to know that this premise is completely unsound.

The defendant did at that time and place what an attorney if he had been present would undoubtedly have advised him to do and what he obviously thought was both the orderly and prudent thing to do, for his denial of his accuser's statement would have availed him nothing at his trial. His denials of this woman's statements might have brought him rebuke or something worse from the officers present, and he might well have reasoned that if he had replied in that hostile environment to what this woman said, his replies might not have been either accurately or fairly recorded.

The majority opinion finds the "justification" for the admission of this challenged evidence "in the age-long

experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him and a failure to do so is therefore some indication of guilt."

I do *not so read* the record of "the age-long experience of mankind." We do not have the records of *all* those cases where human beings have been accused falsely since the beginning of "this warfare called life", but we have enough of them to prove conclusively that whether or not a person will reply to accusations made against him depends on several factors which must *first be determined* before *any* evidential value can be attributed to his silence. Among these factors are these:

(1) *The time and place* they are made.

(2) *By whom* they are made. No man will be as likely to reply to an accusation made by a disreputable character as he will to an accusation made by a reputable character. For example, under the duelling code, a gentleman was not required to challenge a rowdy who insulted him but he was required to challenge a man of standing who had insulted him.[1]

(3) The *reactions* of *the man himself,* according to *his* nature, to accusations made against him. *This is the most important factor of all.* We know from history and from human nature that *many* persons will *never* answer *any* accusations made against them (unless called upon to do so at a formal trial). This is true both of prominent[2] personages and of obscure persons.[3] We can

---

[1] What Hamilton said about Aaron Burr was said by many without any "reaction" from Burr, but when *Hamilton* said them, Burr felt himself "in honor bound to call him to account".

[2] Even Theodore Roosevelt, despite his well-known bellicosity, never answered the wide-spread accusations that he drank alcoholic liquors to excess until he answered them conclusively in a court of justice. The same unfounded accusations of inebriety were frequently made against President Andrew Johnson but he never made any denial of them.

[3] From time to time one sees in the press a statement by some "accused" citizen to this effect: "I have nothing to say; I do not propose to try my case in the newspapers."

judge how human nature customarily acts toward accusations by reading the "case histories" of those who were of such prominence that their entire lives have been revealed. For example, when Washington was President of the United States and residing in Philadelphia, the local "Aurora", edited by Benjamin Franklin Bache (Franklin's grandson), charged Washington with "overdrawing his salary" and being a "common defaulter". When Washington left the presidency on March 4, 1797, Bache's newspaper said: "If ever there was a period for rejoicing, this is the moment . . . The name of Washington from this day ceases to give a currency to political iniquity and to legalize corruption" (Dictionary of American Biography, Vol. 1, p. 462). There is no record of Washington ever replying to these accusations, but his silence has never been "admitted" as evidence against his integrity in the court of history.

In 1795 Thomas Paine wrote President Washington "an open letter" in which he said: "The world will be puzzled to decide whether you are an apostate or an imposter; whether you have abandoned good principles or never had any." (Paine's Works, Vol. 5, p. 200-1.) Though Paine was a man of some consequence, Washington made no reply to him. History has not interpreted his silence as an "admission" of the truth of Paine's charge.

One of Lincoln's best known statements begins with these words: "If I should read, much less answer, all the attacks made upon me this shop might as well be closed for any other business." [4]

---

[4] The entire paragraph from which this sentence is quoted was in a 4 x 8 inch easel frame on President Taft's desk in Washington in 1912. On June 1, 1943, it was in an 18 x 24 inch frame hanging conspicuously on the wall of the office in Washington of one of the most powerful officials of the United States. The conspicuous exhibit of this paragraph by these men indicated their belief that "silence" in the face of attacks "is golden", i. e., that it is more salutary than self-incriminating.

President Grant in his Second Inaugural Address declared that "throughout the war and . . . to the close of the last Presidential campaign I have been the subject of abuse and slander scarcely ever equaled in political history". There is no record of Grant's having made reply to *any* of this abuse and slander. He was known as "the silent man", but his silence in the face of accusations was never interpreted, except by the thoughtless and the malicious, as "giving consent" to the truth of these attacks.

Blaine in his Memorial Address on Garfield said that during the latter's campaign for President he met "with a storm of detraction and it continued with increasing volume and momentum until the close of his victorious campaign. . . . Under it Garfield was calm and strong and confident." The biography of him by Theodore Clark Smith (vol. 2, p. 1027) says: "Garfield persisted in his intention to make no personal reply to any Democratic charges, but for such a seasoned stump speaker and campaigner to hold complete silence was a strain on his endurance."

In the Memorial Address made on Roscoe Conkling before the New York legislature at Albany on May 9, 1888, one of the nation's foremost orators said of Conkling: "Sensitive to the last degree he keenly felt the blows of the envious and obscure . . . but he would not stoop to ask or give an explanation though he held in light esteem a friend who heard with half-believing ears the slanders of a foe. He was maligned, misrepresented and misunderstood, but he would not answer. He was as silent then as he is now—and his silence, better than any form of speech, refuted every charge."

At the most famous trial in all history it is recorded of the Divine Defendant: "And the chief priests accused him of many things, but he answered nothing." And Pilate said: "Answerest thou nothing? Behold how many things they witness against thee." Again there

was no answer, "so that Pilate marvelled". Mark 15: 3, 4, 5.

These (and many other similar examples which could be cited) demonstrate that the cliche, "Silence gives consent" is as unreliable a rule of evidence as that other historically discredited cliche, "Where there is smoke there is fire" (meaning that if enough people can be found to circulate a slander, it should be accepted as having a basis of fact). Shakespeare, who "knew the brain and heart of man" as few have ever known them, discredited that cliche in "Othello" where he demonstrated that

> "Trifles [5] light as air
> Are to the jealous, confirmation strong
> As proofs of holy writ".

When a judicial decision is based on a catchy cliche, it is built upon a very uncertain foundation, for each of these hackneyed phrases has its equally popular contradiction, for example: "Silence gives consent" is set off by "Silence is golden", and also by "Even a fool when he holdeth his peace is counted wise and he that shutteth his lips is esteemed a man of understanding": (Proverbs 17:28); and "Wise men say nothing in dangerous times": (John Seldon, Wisdom); and "Silence never shows itself to so great an advantage as when it is made the reply to calumny and defamation": (Addison in the "Tattler"); and "Be silent and safe—silence never betrays you": (John Boyle O'Reilly in "Rules of the Road"); and "Silence is the most perfect expression of scorn": (George Bernard Shaw).[6]

---

[5] Such trifles are "confirmations" not only to the "jealous" but also to the envious and the malicious.

> "No might nor greatness in mortality
> Can censure 'scape; back-wounding calumny
> The whitest virtue strikes. What king so strong
> Can tie the gall up in the slanderous tongue?"
>
> Measure for Measure,
> Act iii, sc. 2.

[6] Other examples of contradictory cliches are these: "Look before you leap"—"He who hesitates is lost"; "A rolling stone gathers

That the phrase "Silence gives consent" cannot be used as a rule of evidence was recognized by one of our greatest American judges, Chief Justice Shaw, of Massachusetts. He ruled on this very question in *Com. v. Kenney*, 53 Mass. 235. A man had had his money stolen. Pointing to K. he said, "That man stole my money." K. made no reply. Chief Justice Shaw said: "The declaration of the party robbed, to which the defendant made no reply, ought not to have been received as competent evidence of his admission. The statement was made whilst he [the defendant] was under arrest, and in the custody of persons having official authority. If not strictly an official complaint to officers of the law, it was a proceeding very similar to it, and he might well suppose that he had no right to say anything until regularly called upon to answer. . . . The verdict must be set aside."

In *Com. v. Zorambo*, 205 Pa. 109, 54 A. 716, this Court, speaking through Mr. Justice Brown, said that the silence of a defendant who at a hearing before a magistrate was accused of crime "cannot be regarded as even the slightest evidence of his guilt. . . . That he kept silent was his right, as, at the time, he must have understood it, and the manifest error was committed in submitting his silence to the jury as circumstantial evidence against him."

In *Com. v. Coyne*, 115 Pa. Superior Ct. 23, the defendant was charged with keeping a gambling house. On one occasion while a man and woman were at the bar on the floor below the alleged gambling house, the defendant was introduced as "one of the bosses" (i.e. of the alleged gambling house). The Superior Court in an opinion by Judge Keller held that this remark "was not of such a character, or upon such an occasion, as called for or required any response or denial on his part, and his fail-

---

no moss"—"Still water stagnates"; "The Lord loveth a cheerful giver"—"Fools and their money are soon parted"; "The early bird catches the worm"—"The early worm gets caught"; "Absence makes the heart grow fonder"—"Out of sight, out of mind".

ure to deny it at the time cannot be considered as an admission by him that it was true."

In *Moore v. Smith,* 14 Sergeant & Rawle 388, this court said of the proposition that silence gives consent: "That presupposes a declaration or proposition made to him, which he is bound either to deny or to admit. . . . Nothing can be more dangerous than this kind of evidence; it should always be received with caution, and never ought to be, unless the evidence is of direct declarations of that kind, which naturally calls for contradiction. . . . Of all evidence, loose, hasty conversation is entitled to the least weight."

In *People v. Rutigliano,* 261 N. Y. 103, 184 N. E. 689, the New York Court of Appeals ruled exactly the same way as the foregoing cases, saying, "No cautious person, when in custody, accused of crime would care to enter into a discussion of his guilt or innocence with his captors and codefendants, when what he said might be used against him. . . . He is then under no duty to speak and his silence should not be counted as giving assent to what he hears. If he had counsel, he would doubtless be advised not to talk. If he had not, he should not be prejudiced thereby."

In *Riley v. State,* 65 Southern 882, the Supreme Court of Mississippi held that it was reversible error to admit at the trial of a case a statement made by a wife to her husband that he had forced her to kill deceased, to which statement defendant made no defense. The court said, "Speaking for the average man, we are of opinion that appellant was not called upon to deny the statement of his wife, made under the circumstances surrounding them at the time. His failure to deny, dispute, or hedge meets with our idea of what a normally prudent and sensible man would naturally have done, and therefore the evidence had no probative value, but was probably very damaging to him with the jury."

In *Hersey v. Barton,* 23 Vt. 685, the Supreme Court of Vermont said, "To hold that a person is bound, upon

all occasions, when his adversary, in his presence, is making statements to others and not addressed to him, but which are adverse to his interest, to repudiate the same, or that his silence should be taken as an admission of the truth of those statements, would in our judgment be unsound in principle and unwarranted by authority."

In *Pawlowski v. Eskofski*, 244 N. W. 611, the Supreme Court of Wisconsin said: "The inference of assent (by silence) may be safely made when no other explanation is equally consistent with silence; and there is always another such explanation. This much has always been conceded judicially when the question has been presented." It also quotes *Wiedemann v. Walpole*, 2 Q. B. 534, 539: "Silence is not evidence of an admission, unless there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not."

In *People v. Pignataro*, 263 N. Y. 229, 188 N. E. 720, the Court of Appeals held: "The principle as now established in this state to the effect that a person in custody charged with crime is under no duty to speak and that his silence shall not be counted as giving assent." To the same effect are *Geiger v. State*, 70 Ohio 400, 71 N. E. 721, and *State v. Wargo*, 83 N. H. 532, 145 A. 456. In *Child v. Grace*, 2 C. & P. 193, where the evidence of the failure to reply was excluded, Chief Justice Best said: "If such evidence is allowed, we shall have causes tried at the police offices before they come here." In *McElmurray v. Turner*, 86 Ga. 215, 12 S. E. 359, it was ruled that silence does not mean assent. To the same effect is *Bell v. State*, 93 Ga. 557, 19 S. E. 244. The same ruling was made in *Johnson v. Holliday*, 79 Ind. 151. In that case it was held that defendant's failure to deny statements of a witness before the magistrate is not admissible. To the same effect is *Hauser v. Goodstein*, 75 N. J. L. 66, 66 Atl. 932. In *State v. Kissinger*, 343 Mo. 781, 123 S. W. 2d 81, it was held that defendant's silence to a statement made by his wife in response to the in-

quiry of officers in his presence was inadmissible. Tipton, Judge, said: "It would have been an intrusion on the part of the appellant to have interfered in this conversation to which he was not a party."

The cases cited by the majority opinion are distinguishable from the case at bar, as I now point out. In *Com. v Turza*, 340 Pa. 128, 16 A. 2d 401, the opinion shows that when one of the co-defendant's confession was read to Turza the latter said, "If the jigs say it's right, it's right." Also, "You'll see, you'll see." The opinion also says that "his [defendant's] grinning silence when the White statement was read to him . . . was extraordinary under the circumstances." "Evidence of this character is for the jury whenever the occasion and the attendant circumstances call for serious admission or denial, its weight depending upon the force of the circumstances and the motives which must impel one so accused to an explicit denial if the statement be untrue." Here there was no silence but an express acquiescence in another's statement. In *Com. v. Rose*, 327 Pa. 220, 193 A. 17, this court said: "If he [the defendant] had persisted in this attitude and had consistently denied the statements of the other participants, or had he remained silent with no real duty to speak, no part of this examination would have been admissible against him. Such statements become of probative value only where defendant has heard or read them, and conceded that they are correct", citing cases. ". . . Rose . . . did not persist in his denial. . . . He admitted his participation with the others in everything that occurred, denying only that he fired the shot that killed. This was immaterial since he was jointly engaged with the others in the perpetration of a felony. . . ." In *Com. v. De Palma*, 268 Pa. 25, 110 A. 756, this court did admit the evidence of the direct accusation of the defendant's wife, but it based its ruling on *Com. v. Zorambo*, 205 Pa. 109, 54 A. 716, and *Com. v. Aston*, 227 Pa. 112, 75 A. 1019. We have already pointed out that the opinion in the *Zorambo* case does not sup-

port this ruling but is exactly to the contrary. In *Com. v. Aston*, 227 Pa. 112, this court in its brief opinion said nothing about the question now before us, although the opinion of the court below is referred to. In that opinion the *Zorambo* case was cited as expressive of the rule to be applied in cases of this character. In that case also the court below declared that "he [one of the defendants] did not deny the truth of what Fornwalt [the other defendant] said, but said that what he said about the whiskey was true, and then gave his version of the whole affair, which confirmed much of what had been said by Fornwalt in his presence. Under the circumstances we do not think that the objection to the admission of Fornwalt's statement can be seriously made."

In *Com. v. Carelli*, 281 Pa. 602, 127 A. 305, the confessions of defendant's companions were put in evidence because they were "at least tacitly assented to by him", but the court was careful to protect the defendant from any undue effect being given to these confessions by saying to the jury: ". . . Now his silence . . . does not necessarily mean that he assented to the statement, but it is a significant fact." In the case at bar the statement of the defendant's silence was put in evidence and the court was not careful to protect defendant from any undue effect being given to this woman's statement in defendant's silence.

In *Com. v. Ballon*, 229 Pa. 323, 78 A. 831, the statement of a co-defendant was read to the defendant and "not only did he make no denial of the statements it contained with respect to his own complicity, but became visibly affected, and several hours afterwards made his own confession above referred to." In the instant case there was no statement made *to the defendant*, nor any evidence that he became "visibly affected" when hearing this woman talk.

In *Com. v. Murphy*, 92 Pa. Superior Ct. 139, a defendant had four accomplices, each of whom made a confession involving the defendant. These confessions were

"read to him one at a time". He remained silent and his silence was admitted in evidence against him, the Superior Court holding that "the circumstances were such as to render it more reasonably probable that the accused would reply to the accusations than that he would remain silent". It seems from the report that the point stressed in this appeal was that the Court permitted the confession as to accomplices *to be sent out with the jury.* See syllabi note and also the statement before the opinion: "Error assigned, among others, was in permitting written confessions to be sent out with the jury." The opinion, as to defendant's "silence", cites *Com. v. Brown,* 264 Pa. 85, where this court without discussing this question thoroughly said that the non-denial of a charge "was evidence from which the jury might infer an admission" of guilt, citing *Com. v. Leskoski,* 225 Pa. 382, and *Com. v. Ballon,* 229 Pa. 323. These two cases fall far short of sustaining the position taken by the Commonwealth here. In the *Leskoski* case, the Commonwealth was permitted to show *in rebuttal* that the victim of the shooting had said to the defendant that he shot her and the defendant answered: "Did I shoot you?", and she replied "Yes". Here was an accusation levelled directly at the defendant, and his reply was equivocal. In the case at bar no accusation was levelled directly at the defendant and he made no statement at all as the woman was being examined. He was not even a party to the question and answer "depositions" the woman was making, except that his name was involved therein. *Com. v. Ballon* we have already discussed. In support of its position the Superior Court in *Com. v. Murphy,* supra, cites Wigmore, Vol. 2, sec. 1071 (Edition of 1904). That section of Wigmore (Edition of 1923) says: "The general principal of relevancy . . . tells us that the inference of assent may safely be made only when no other explanation is equally consistent with silence; . . ."

The case most relied on by the Commonwealth is *Com. v. Weigand,* 134 Pa. Superior Ct. 603. This case

differs from the instant case in that there was a direct accusation made against the defendant in that case. The record shows that "Mrs. Mayes pointed to the defendant and said he was the one that performed" the illegal operation and "it cost her forty dollars". The defendant was then asked: "if he had anything to say and he had nothing to say". The Superior Court said: "It does not appear to us that [an innocent man] would have remained silent under such serious charges." In the instant case no one "pointed to" this defendant and he was not invited to say anything. He had no reason to believe that he was *expected* to say anything. It was the woman and not himself who was being interrogated. He might reasonably have expected that his own interrogation would come later. The accusation implicit in the woman's statements was made not *to him* but to the officers. Furthermore, it was not nearly so serious as the charge in the *Weigand* case in which death had been feloniously caused allegedly by the defendant in that case. One's natural reaction to a less serious charge is likely to be less violent than to a grave charge such as the one made against Weigand. For example, if the "average man" was taken to the district attorney's office in some city and directly charged with a murder of which he was innocent, he might be shocked into making an instantaneous denial, whereas if he was taken to the same place and heard some women narrate to the officers a story which indicated that he was guilty of violating the Mann Act, 18 U.S.C.A. sec. 397, when in fact, he was not so guilty, he would be likely to conclude that he was being made the victim of a blackmail plot and if he had even ordinary "common sense" would *say nothing* until he could consult with counsel. Even innocent men have been known to "talk themselves into jail". When any man talks in the presence of only his accusers and hostile officers, his "talk" may not be recognizable even by himself when next he sees it in print or hears it reported.

There is no principle more carefully applied in the administration of the criminal law than the principle that if any fact is *as consistent with* the hypothesis of a defendant's innocence as it is with the hypothesis of his guilt, that fact shall *not* militate against the defendant. We said in *Com. v. Benz,* 318 Pa. 465, 472, 178 A. 390: "The evidence must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence." We reiterated this in *Com. v. Bardolph,* 326 Pa. 513, 521, 192 A. 916.

The logic of this principle is at the basis of Wigmore's statement, quoted above about "inference of assent". Trial judges are the preliminary testers of the probative value of evidence. If the evidence has *enough* probative value to be worthy of the jury's consideration, it should be admitted and the jury should give it appropriate weight in effecting persuasion. When any evidence is equally consistent with defendant's innocence as it is with his guilt it should, of course, be excluded, for if it is admitted, the jury can only guess about its significance, and we have repeatedly declared both in civil and in criminal cases that juries must not "conjecture" on the issues before them. We said in *Com. v. Petrillo,* supra, (p. 96): "The trial judge should not let the jury *conjecture* as to the guilt of the person to whom the evidence relates." In *Whigham v. Metropolitan,* 343 Pa. 149, 156, we said: "Mere conjecture or guesses do not supply this proof" [required of plaintiffs in civil cases].

Certainly other explanations than guilt are "equally consistent" with this defendant's silence. Judge Kenworthey in his Superior Court opinion succinctly listed the "surrounding circumstances" which make this evidence inadmissible, as follows: "(1) the meeting was deliberately staged for the purpose of procuring evidence, (2) the meeting was a relatively formal proceed-

ing, (3) appellant had been charged wtih the crime and was under arrest, (4) he was present at the meeting under compulsion, (5) the only persons present were hostile to him, and (6) he was not asked any questions until after the meeting had been concluded." The policeman Calahan who testified as to the accusations said that at the conclusion of the questioning of Miss Ewadinger he asked Vallone if he knew her and he said that he had known her. The court then asked the officer: "Did you say anything to Mr. Vallone?", the answer was, "No, sir."

It is clear from all this that the defendant must have regarded the questioning of this woman as none of his affair and that for him to have said anything at that time and place would have been an ill-mannered intrusion. He was not even asked by the officer or by any one as to whether or not he conceded this woman's statements to be true.

The majority opinion says that the rule [as to silence giving consent] reflects only the manner in which "the *average* man is apt to conduct himself in such a situation".

I submit that when "the average man" is taken into custody and conducted by an officer to a district attorney's office in some city and there hears a woman like this one making statements implicating him in a crime, he will make *no answer* to such statements, particularly when he is not invited to do so. Suppose the officer said to this defendant, "What have you got to say to the accusation this woman makes against you?", and he replied, "I have nothing to say; I wish to consult counsel." Will anyone contend that such an answer under these circumstances should be received in evidence as admission of his guilt? He would be acting as an "average man" if he had made the answer just suggested to the supposed question, and in my judgment he acted as an "average man" when he said *nothing* at the time and place stated, and it is fair to presume that he *did* wish

to consult with counsel before making any statement.[7]

The majority opinion says: "Our conclusion . . . is that the view adopted by the Superior Court errs in its failure to distinguish between the competency of the evidence and the weight that should be attributed to it by the jury."

Even conceding that this testimony was competent (which I do not concede), I still think it was harmful error for the court to admit this testimony without giving the jury some instruction as to how this kind of testimony should be tested and weighed. This court said in *Sears v. Birbeck, et ux.*, 321 Pa. 375, at 383 (184 A. 6): "It is a primary duty of the trial judge—a duty that must never be ignored—in charging a jury to clarify the issues so that the jury may comprehend the questions they are to decide." One issue in the trial of the case at bar was the *weight* to be accorded to this challenged testimony after it was improperly admitted. The jury had heard defendant's counsel object to the admission of this evidence as "an effort now being made to attach to the defendant an admission by silence on the part of himself to questions that were asked of Alice Ewadinger in his presence". Counsel then gave good reasons for his objections, such as that defendant when in the district attorney's office being "in hostile company" and "not being permitted to interpose any objections to what was being said about him" etc. The jury heard the court say: "Objection overruled". Later the jury was instructed by the court that "all of the evidence in this case is important and all of it is for the jury" and "it will be your duty to consider all this testimony impartially", and "to make deductions or inferences from established

[7] When the district attorney was arguing this appeal before this court the writer of this opinion asked him this question: "If you had been this defendant's attorney before he went to the district attorney's office wouldn't you have advised him to say nothing?" He declined to answer this question other than by smiling and replying: "That's a hard question to put to me."

facts." It is fair to assume that the jury did consider the evidence so admitted, as being evidence of the admission by the defendant of his guilt, because it had a right to do so under the ruling of the court. It is also reasonable to presume that the district attorney commented on the evidence in his closing argument. When the case was argued before us the district attorney neither admitted nor denied that in his address to the jury he commented on this evidence. Inasmuch as he succeeded in having it admitted he would not be likely to fail to use it in his closing argument.

Since this evidence *was* admitted defendant was entitled to have the jury instructed as to *how* to measure its weight. The trial judge should have said to the jury substantially this: "This defendant was under no legal duty to speak when he heard this woman make accusations against him before these officers and his silence at that time *if you can find any other reasonable explanation of it* shall *not* be accepted by you as evidence of his assent to these accusations. His silence then and there can be construed as admission of the truthfulness of the accusations he heard made only if *that* is the *only reasonable explanation of it*."

Wigmore in his 3d ed. of Evidence, Sec. 28, p. 409, refers to the [proper] "efforts" of a trial judge "to prevent the jury from being satisfied by matters of slight value, capable of being exaggerated by prejudice and hasty reasoning". He then adds: "Legal relevancy denotes, first of all, *something more than a minimum of probative value,*" and quotes Edmund Burke as saying that Judges must "observe much on its [evidence's] credibility, or the most dreadful consequences might follow." In the case of *Com. v. Carelli,* supra, cited in the majority opinion, the trial judge guarded the admission of this testimony by saying to the jury what we have already quoted and adding: "If his silence was not because of any fear or threats or intimidation or any improper influence in that way, on the part of the officers

who had him in charge, his silence would apparently be an acquiescence in what they said." In the instant case there was nothing in the judge's charge indicating to the jurors that they did not necessarily have to take the defendant's silence at its "face value" as "giving consent" to the woman's statements. From what the jurors *heard said* when defendant's counsel objected to this testimony, they were justified after hearing the objection overruled in believing that this evidence was in law an "admission by silence", practically equivalent to a confession of guilt.

Wigmore in Vol. VIII of his 3d ed. on Evidence, Sec. 2272, says: "In the United States almost universal legislation decrees, in varying phraseology, that the inference [from defendant's silence in the courtroom] shall not be availed of." I submit that logic and consistency require that an inference from a defendant's silence *when he is under arrest* and *without counsel to advise him* "shall" like his silence in the courtroom, "not be availed of".

This "universal legislation" referred to by Wigmore is based on the sound understanding that there may be many reasons, *other than guilt,* for a man to remain silent when accused of crime, and that, therefore, to draw an inference of guilt from his silence is wholly unwarranted and will not be permitted.[8]

That to hold silence in the courtroom as not evidence of guilt while silence outside the courtroom is such evidence, is illogical and anomalous, is the view taken by the highest court of New York: In *People v. Page,* 162

---

[8] This court in *Com. v. Green,* 233 Pa. 291, 82 A. 250, held that it was reversible error for the district attorney to say to the jury in a case where the defendant did not take the stand: "There is no one on earth who can tell how these things came into the possession of the prisoner, but the prisoner." In *Com. v. Foley,* 24 Pa. Superior Ct. 414, that court reversed a conviction because the district attorney said in his closing argument: "You have this woman here without denial."

N. Y. 272, 56 N. E. 750, a woman testified that after the alleged commission of the offence of which the defendant was charged she had a conversation with him in which she stated to him that Etta Hopkins had stated to her that he had committed the crime of rape upon her, and she testified that he did not deny it. Because of the admission of this testimony the judgment was reversed. The Court of Appeals said: "It cannot be that there is any such anomaly in the criminal law as is involved in the proposition that an accused person, when charged with the offense in open court by indictment, may stand mute without prejudice to his innocence, while the same person is bound to deny neighborhood gossip with respect to his guilt at the peril of furnishing by silence evidence against himself when on trial upon the charge." In other words, if a prisoner while in the courtroom is entitled—as he is—to whatever "refuge" he can find in silence, he is equally entitled to that same "refuge" when he is outside the courtroom.

The "vice" in using this "evidence of silence" against a prisoner is that it is of too slight, if any, significance and is merely *conjectural* and yet possibly harmful to a defendant when considered by untrained minds, and therefore it should not go to a jury at all. Thayer in his Preliminary Treatise on Evidence at the Common Law (p. 266) says: "Some things are rejected [in evidence] as being of too slight a significance, or as having too conjectural and remote a connection; others, as being dangerous in their effect on the jury, and likely to be misused or over-estimated by that body. . . ." (p. 267): "The law of evidence is the creature of experience rather than logic, and we cannot escape the necessity of tracing that experience." (p. 269): "Admissibility is determined, first by relevancy,—an affair of logic and experience, and not at all of law; second, but only indirectly, by the law of evidence, which declares whether any given matter which is logically probative is excluded. . . . This great multitude of decisions, emerging day by day,

and holding that such and such evidence is or is not admissible, . . . are really reducible to mere propositions of sound reason as applied to a point of substantive law or pleading."

There is of course no valid analogy, as the majority opinion contends, between the rule that "flight is evidence of guilt" and the saying that "Silence gives consent". Flight *is* evidence of guilt, for *innocent* men when they learn that they are wanted for a crime or even that they are under the suspicion of having committed a crime do *not* run away or hide themselves. On the contrary, they *almost invariably* seek out the authorities and say: "If you are looking for me, here I am. If you have anything against me, produce it."

On the other hand, as we have shown, an individual accused by another and especially if that other be a disreputable person, does not ordinarily deem it incumbent upon himself to make a denial of the accusation, except when the matter reaches trial. If a man is *wanted by the authorities* for allegedly committing a crime it is his *moral* duty, if not his legal duty, *not* to hide himself but rather to make his appearance. When a man is *accused* of something wrongful he is under no moral duty whatsoever to *deny* the accusation; he has a right to *await his accuser's action and call for his proof*.

Just as there are many "popular" legends that will not stand the searchlight of painstaking history, so there are many "popular" sayings that will not stand the test of sound reasoning. "Silence gives consent" is one of these. That this has been rejected as a rule of evidence by many courts of the highest judicial credit is evident from a review of the authorities. The position of our State Appellate Courts on this question has not been consistent and unequivocal. To bring our law on this subject in accord with sound reasoning and the weight of authority,[9] I would lay down the rule: First, that the

---

[9] In addition to the opinions heretofore cited, these opinions in the Supreme Court of Vermont are pertinent. In *Vail v. Strong*, 10

silence of a person under arrest, in the face of accusations made against him by a third party, shall not be used against him at his trial. (This is consistent with what this court ruled in *Com. v. Zorambo, supra*) ; Second, that if there *are* some extraordinary circumstances which make a defendant's silence in the face of accusations against him consistent *only* with *his acquiescence in them so that no other explanation of his silence is reasonable,* the evidence of silence may be admitted, but in *that contingency* the jury must be carefully instructed as to *how* to weigh that evidence. In other words, a trial judge would decide in the first instance whether or not the evidence has sufficient probative value to make it admissible and if he decided that it had sufficient relevancy *to be admissible,* the jury would then decide *how much* probative value it had.

I agree with the Superior Court that "the proof of what transpired at the meeting [in the district attorney's office] was wholly inadmissible. And since there was virtually no other corroboration of the commonwealth's principal witness, it undoubtedly carried great weight with the jury and was prejudicial to him."

I would affirm the judgment of the Superior Court on the able opinion of Judge Kenworthey.

---

Vt. 457, 463, it was held: "The strength of the evidence [of silence] depends altogether upon the force of the circumstances and the motives, which must impel him [the defendant] to an explicit denial, if the statement be untrue. But if no good reason exist to call for disclosure, and the party declines to enter into useless discussion, or answer idle curiosity, no legitimate inference to his prejudice can be drawn from his silence." In *Mattocks v. Lyman,* 16 Vt. 113, 119, it was said: "With some men, perhaps, silence would be some ground of inferring assent, and with others none at all. The testimony then would depend upon the character and habits of the party,—which would lead to the direct trial of the parties, instead of the case."